Argued and submitted October 8, 1979, reversed
and remanded May 5, reconsideration denied June 12,
petition for review denied July 2, 1980 (289 Or 337)

BUSCH, et al,
*Appellants,*

*v.*

RANGER INSURANCE CO.,
*Respondent.*

(No. 11,278, CA 12741)

610 P2d 304

[17]

W. Eugene Hallman, Pendleton, argued the cause for appellants. With him on the briefs were Monahan and Grove, Milton-Freewater, and Mautz and Hallman, Pendleton.

John L. Langslet, Portland, argued the cause for respondent. With him on the brief was Martin, Bischoff, Templeton, Biggs & Ericsson, Portland.

Before Joseph, Presiding Judge, Richardson, Judge and Warden, Judge.*

JOSEPH, P.J.

---

*Warden, J., *vice* Lee, J., deceased.

## JOSEPH, P.J.

This was an action by the owners of a twin-engine aircraft against their insurer to recover the cost of certain work on the aircraft's engines following a ground strike by both propellers on a runway during a landing. The principal issue is whether expenses incurred by the insureds to secure certification of the aircraft's engines as "airworthy" after the incident constitute "direct and accidental loss of or damage to the aircraft" under the following provision in the aircraft insurance policy:

"Ranger Insurance *** agrees with the Insured *** subject to the limits of liability, exclusions, conditions and other terms of this Policy:

"* * * * *

"*Coverage G- All Risks While in Motion.* To pay for direct and accidental loss of or damage to the aircraft, hereinafter called loss, occurring while the aircraft is in motion under its own power or the momentum generated therefrom, or while the aircraft engine is operating, including fire or explosion caused by or resulting from collision of the aircraft with any object and including disappearance if the aircraft is missing and not located for sixty (60) days after takeoff."

The case was tried to the court without a jury. Plaintiffs appeal from the judgment.[1] We reverse.

The aircraft's pilot, plaintiff Busch, made a "wheels-up" landing at Martin Field near College Place, Washington. Though the wheel assemblies on this particular aircraft allow it to roll on its wheels when they are not fully lowered for landing, such a landing nevertheless may result in the propeller blades striking the runway, which in turn may result in a rapid deceleration of the engines. Here, the ground strikes bent the propeller blades on both propellers at right angles about 12 to 16 inches back from the blade tips. Busch testified that one engine stopped

---

[1] After the filing of the action, defendant tendered the amount claimed for hull damage. The judgment was in favor of plaintiff for $480 as attorney fees for that portion of the claim.

at some point before the plane "skidded about half-way to a stop" about 700 feet after touching down.[2]

While the aircraft was at Martin Field, its engines were inspected by defendant's adjuster for evidence of internal damage. It is not important to recount the details of that inspection, other than to say it did not entail disassembling (or "tearing down") the engines and that it yielded no indication of internal damage to either engine. Defendant's position with respect to any work on the engines was explained by the insurance adjuster at trial:

"*** [T] he position of the carrier would be that they would not pay for anything other than damage, physical damage. *** I told [Busch] if he did have a tear down, and there was no damage found, that they would not cover the costs or the tear down - the inspection. If there was damage found, we would pay for that damage, pay for the cost of getting to the damage and the take down of the engine."

The aircraft also was inspected at Martin Field by an aircraft mechanic licensed by the Federal Aviation Administration (FAA). FAA regulations prescribe detailed procedures and standards for civil aircraft "maintenance," defined at 14 CFR § 1.1 to include "inspection, overhaul, repair, preservation, and the replacement of parts." The Martin Field mechanic made his own assessment of the ground strikes on the engines and was required by FAA regulation to make an entry in the maintenance logs that must be kept for each engine and for the aircraft. The following entry was made in the three logs:

"Engine *unairworthy* due to sudden stoppage, and no disassembly and inspection as per Lycoming service letter L. 163A dated 8/25/72.[3] Prop bent

---

[2] There was also damage to the plane's hull, but there is no issue concerning either the hull or propeller damage on the appeal.

[3] The reference is to a document captioned "Service Letter No. L 1634" to "All Owners and Operators of Avco Lycoming opposed series aircraft

[20]

approx. 90 degrees 12 inches in from tips." (Emphasis in original.)

The reason for the entries, notwithstanding the absence of any outward indication of internal engine damage, was explained at trial as reflecting the probability that the engines' dynamic balancing counterweight assemblies on the crankshafts had been damaged and the engines had thereby become 'detuned.' The counterweights could not be inspected without tearing down the engines.

engines" on the subject of "Recommendations Regarding Accidental Engine Stoppage." It states, so far as relevant here:

"*** [T] he severity of damage to the propeller and suddenness of the stoppage must be the two factors on which to base judgement as to whether inspection of the engine is required. For example, it is generally accepted that minor propeller damage of less than the four inches at the blade tip will not cause latent internal damage and the engine can be continued in service with reasonable assurance of trouble free operation.

"However, Avco Lycoming must take the position that in the case of sudden engine stoppage the safest procedure is to remove and disassemble the engine and inspect completely the reciprocating parts. Any decision to operate an engine which was involved in a sudden stoppage without such inspection must be the responsibility of the agency returning the aircraft to service."

FAA Advisory Circular No. 43.13-1 § 361A (1965), which recites that it "contains methods, techniques, and practices acceptable to the [FAA] Administrator for inspection and repair to civil aircraft," states:

"Powerplant Sudden Stoppage. For the purpose of this section, powerplant sudden stoppage refers to any momentary slowdown or complete stoppage of the main shaft of an aircraft powerplant ***. Any aircraft powerplant that has been subjected to sudden stoppage should be inspected to the extent necessary to assure continued safe operation. These procedures will serve as a guide for locating damage that may occur whenever an aircraft powerplant has been subjected to sudden deceleration or stoppage.

"To fully evaluate any unsatisfactory findings resulting from this type of inspection, it will be necessary to refer to the applicable manufacturer's service and overhaul data. In addition, many of the prime aeronautical engine manufacturers now have specific recommendations on the subject of sudden stoppage involving their products. To assure continued airworthiness and reliability, it is essential that such data be used to supplement or, where necessary, supersede procedures contained herein."

[21]

Thus, under the FAA's system for regulating the maintenance and repair of civil aircraft, plaintiffs' aircraft, once having been determined not to be airworthy, would not be approved as airworthy and could not be returned to service until the engines had been torn down, inspected and approved. Defendant refused to pay for any of the work performed on the engines, and this action ensued.

We turn now to the principal issue identified at the outset: namely, whether any of the work performed on the aircraft engines was covered by the all-risks provision quoted earlier. Plaintiffs point to the general principles affording broad insurance coverage under all-risks insurance[4] and argue that it is consistent with such principles to view coverage here as extending to the cost of engine tear downs and inspection necessary to certify the aircraft as airworthy. We agree. Further, we believe that the issue is a relatively simple one of construing the words of the policy quoted above.

The trial judge said in his memorandum opinion:

"In view of the report *** that there was no damage to the engine[s] other than normal wear and tear, it is apparent that plaintiffs' claim is not for damage, but for safety inspection for certification. Plaintiffs' claim for this amount therefore will be disallowed and [plaintiffs will be] allowed judgment only for the amount of the actual physical damage ***."

[4] *E.g.,* Annotation, 88 ALR 2d 1122, 1125 (1963):

"A policy of insurance insuring against 'all risks' is to be considered as creating a special type of insurance extending to risks not usually contemplated, and recovery under the policy will generally be allowed, at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding the loss from coverage. ***"

*See also:* 13 G. Couch, Cyclopedia of Insurance Law § 48.138, at 597 (2d Ed); J. Gorman, *All Risks of Loss v. All Loss: An Examination of Broad Form Insurance Coverages,* 34 Notre Dame Law 346 (1959).

That language reflects two erroneous ideas: first, that certification as airworthy or not was irrelevant to whether plaintiffs had suffered "direct and accidental loss of or damage to the aircraft"; and, second, that the policy covered only "physical" damage. As to the latter point, given that the insurer could have so limited its policy expressly but chose not to, the generality of the terms used must be construed in favor of coverage. *Shadbolt v. Farmers Insur. Exch.,* 275 Or 407, 410-411, 551 P2d 478 (1976); *O'Neill v. Standard Insurance,* 276 Or 357, 361, 554 P2d 997 (1976). As to the first error, the insureds, when they bought an "all-risks" policy covering an airplane that could only lawfully be operated if it was certified airworthy, had a right to expect that the coverage would extend to recompense them for all of the consequences of an accident that caused the aircraft to be rendered "unairworthy." Any other reading of the policy would unreasonably defeat the "character and *** beneficent purposes" *(Shadbolt v. Farmers Insur. Exch., supra* at 411) the insureds had reason to understand the policy represented and served. The tear down and inspection was not merely a safety precaution. Without it, plaintiffs simply had no airplane at all as a practical matter. It would be beyond reason to say that all of the risks against which they were insured were only those which produced open and obvious or visually observable destruction of parts of the plane. Such a reading would reduce the damage coverage to a mere portion of the reasonable expectations of the owner of an airplane.

On remand, it will only be necessary to determine which items of expense proved by plaintiffs were necessitated by the federal airworthiness certificate standards. We note in this regard that among the policy's exclusions there appears the following:

> "This policy does not apply:
> "* * * * *
>
> "8. under Coverages F and G: *** (c) to loss of use or depreciation ***."

Reversed and remanded.